## Standard Dairies, Inc., v. McMonagle et al.

*Wesley, Wagoner, Troutman & McWilliams*, for plaintiff.

*Price & Propper*, for defendants.

SLOANE, J., May 2, 1939.—Plaintiff, a Pennsylvania corporation, filed a bill in equity asking that defendant, Daniel S. McMonagle, be enjoined temporarily until hearing, and permanently thereafter, for a period of one year from January 21, 1939, from selling milk or milk products either directly or indirectly within the territory in the City of Philadelphia bounded by Lombard Street and the Navy Yard, and between the Delaware and Schuylkill Rivers.

The bill alleged violation of a restrictive covenant which defendant had executed upon his employment by plaintiff.

A preliminary injunction was granted, and on March 3, 1939, a hearing was held to determine whether or not defendant had violated the terms of the injunction. At this time I determined that the injunction had been violated, but, with the consent of plaintiff's counsel, no action was taken against defendant. Meanwhile a petition for leave to amend the bill (by adding as defendants William and Joseph McMonagle) was granted.

A further hearing was held on March 9, 1939. From the evidence and the admissions in the pleadings, I have arrived at the following

*Findings of fact*

1. Plaintiff is a Pennsylvania corporation conducting a dairy and milk distributing business in the City of Philadelphia.

2. In April 1938, plaintiff engaged defendant Daniel S. McMonagle as a driver of a milk truck, route salesman, and canvasser for the sale of plaintiff's milk, cream, and dairy products in the City of Philadelphia in the territory from Lombard Street to the Navy Yard, and between the Delaware and Schuylkill Rivers.

3(*a*). Before, or at the time when, defendant was so engaged, he executed a form of written agreement under seal prepared by plaintiff, which was, by its terms, to

go in force if and when defendant Daniel S. McMonagle was engaged for the above position.

(*b*) This agreement in its entirety is as follows:

"It is understood that if I am engaged for this position I will put up cash bond of $100 as is required by the company to cover monies and merchandise entrusted to me and comply with all rules and regulations of the company.

"I also agree that I will not work for any competitive company or myself or sell directly or indirectly milk or milk products in the same territory covered by me either as route salesman or foreman of routes for a period of at least one year after severing relations with this company.

"I agree to be responsible for all bills placed on my collection books, and that all bills over and above one or two weeks, as designated by the manager of Standard Dairies, Inc., shall be charged to my account and deducted from my weekly wages unless I am authorized to continue the credit for a longer period by the manager of the company. I also agree that any shortage in merchandise or cash shall be deducted from my weekly wages and that I will not discontinue serving a customer on account of non-payment of their account before having the company's approval to the discontinuance of the same.

"In witness whereof I have hereunto set my hand and seal this April 27, 1938, day of 1938.

Daniel S. McMonagle   (L. S.)

Witness:

E. Clyde Heath

Approved:   Standard Dairies, Inc.

Norman Dunning   (L. S.)"

4. None of the terms of the said written agreement purported in any way to bind plaintiff corporation to any obligation whatsoever.

5. On January 21, 1939, the employment of defendant Daniel S. McMonagle with plaintiff was terminated by act of plaintiff's agent.

6. Thereafter, defendants William and Joseph Mc-Monagle, brothers of defendant Daniel McMonagle, formed a partnership, financed partly by their father Joseph E. McMonagle, and partly by William McMonagle, for the purpose of dispensing milk and milk products in the City of Philadelphia, and employed Daniel S. McMonagle and other persons for this purpose.

7. Neither the partners, nor their father Joseph E. McMonagle, intended to, or did, take actual part in the conduct of this business except for the fact that the father kept the books of the firm. None of them had ever been in the milk business before.

8. While in the employ of the firm, defendant Daniel S. McMonagle solicited trade and made deliveries in the territory described in the written agreement of April 1938, and pointed out his former route, which he had served during his employment with plaintiff, to other persons in the employ of defendant partnership.

9. Defendant Daniel S. McMonagle is paid at the rate of $25 per week for his services to the partnership.

10. It was the primary purpose of defendants in organizing the said partnership to enable defendant Daniel S. McMonagle to continue the occupation of milk delivery and canvassing, both in the territory embraced in the agreement of April 1938, and elsewhere.

11. On January 28, 1939, plaintiff notified defendant Daniel S. McMonagle that he was committing a breach of the restrictive covenant contained in the agreement of April 1938, and demanded that he immediately desist from so doing. This demand was not complied with.

12. One of the former customers of plaintiff, Jacob Levoe, was solicited to purchase milk by a brother of Daniel S. McMonagle, and, upon being informed that

the latter had lost his position with plaintiff, purchased milk from the defendant partnership.

## Discussion

From the foregoing findings of fact it is clear that in April 1938 defendant Daniel S. McMonagle entered into a valid and binding agreement with plaintiff corporation whereby he engaged not to serve or solicit sales of milk in a certain territory within a year after the termination of his employment with plaintiff. It is likewise clear that he has breached that agreement. The question that I am now called upon to determine is whether or not, under all the circumstances of this case, a court of equity should and will enforce such an agreement by injunction.

It will scarcely be contended that the agreement which defendant signed constituted a restraint of trade. In the earlier days, contracts even in partial restraint of trade were held to be unreasonable and void as being contrary to public policy, but now in this State partial restraints, if not unreasonable, are enforcible. Restraints which covered a larger territory and whose inhibition was of longer duration than the present one have been frequently sustained: Light Corrugated Box Co. v. Dubison et al., 26 D. & C. 169 (1936); Erie County Milk Assn. v. Ripley, 18 Pa. Superior Ct. 28 (1901); Srolowitz v. Roseman, 263 Pa. 588 (1919). The cases cited involved restraints similar to the present one in that they were made in conjunction with contracts of employment, in which type of case the rule is somewhat stricter than in cases involving the sale of a business together with its good will.

It does not follow from the rule just enunciated, however, that the present agreement is enforcible in equity. ". . . partial restraints only make the bond good *at law*. Equity is loth, even then, to enforce them, and will not do so if the terms be at all hard or even complex": Keeler v. Taylor, 53 Pa. 467, 469 (1867). An examination of the

Pennsylvania cases dealing with restrictive covenants in employment contracts reveals a number of factors which are of importance in the determination of whether or not equity will exert its extraordinary remedies. Among the most important of these is the factor of "mutuality." Ever since the case of Philadelphia Ball Club, Ltd., v. Lajoie, 202 Pa. 210 (1902), it has been recognized that in the equity courts of this State the requirement of mutuality of remedy does not mean that each party should have precisely the same remedy. It was said in the Lajoie case (p. 220) : "In a fair and reasonable contract, it ought to be sufficient that each party has the possibility of compelling the performance of the promises which were mutually agreed upon." But these words do not dispense entirely with the requirement of mutuality. It must at least appear that there actually were "promises which were mutually agreed upon." Judge Henninger states it well in the recent case of Shor v. Freeman, 21 D. & C. 111, 113 (1934) :

". . . the mutuality required was [is] something more than the mere consideration of employment. No matter to what extent the meaning of mutuality has been relaxed, it must still be something more than mere consideration, for without consideration there would be no contract in the first place . . . plaintiff has promised nothing. He has not agreed to employ defendant for so long as 1 hour, nor has he fixed any compensation for any services rendered."

The latter portion of the quoted excerpt is a precise description of the situation in the instant case. Plaintiff has failed to produce any evidence to show that any reciprocal promise was made to defendant Daniel McMonagle at the time when he executed the agreement. At the most, plaintiff may have promised to pay him a certain wage *if* he performed the services. It is clear from the Shor case, as well as from Iron City Laundry Co. v. Leyton, 55 Pa. Superior Ct. 93 (1913), and American Ice Co. v. Hunter, 60 Pa. Superior Ct. 311 (1915),

that such a consideration, while sufficient to sustain a common-law contract, is not sufficient to constitute either the "fair consideration" or the "mutuality" that equity requires.

"The mere employment of one man by another constitutes no consideration whatever. At that point the values on both sides are equivalent": Seward v. Shields, 9 Dist. R. 583, 584 (1900). See also Penn Coat & Apron Supply v. Hunsicker, 14 Leh. L. J. 108 (1930), Freeman v. Iobst, 15 Leh. L. J. 375 (1933), and General Baking Co. v. Schaffer, 15 Leh. L. J. 248 (1933).

Another equitable principle, closely allied with the "mutuality" concept, is that equity will not give specific enforcement to a "hard-featured" contract. In recent years there has been a growing recognition on the part of courts that in the formation of many contracts one party may be in a dominant position, whereas the other party is, because of economic or other considerations, far from free. While this has not led to a relaxation of the doctrine of consideration, at law, or to a recognition of economic pressure as a form of duress, this realization has found its proper sphere in equity, where the extraordinary remedy may be withheld upon grounds untenable at law. In contracts of employment this element of disparity of bargaining position is particularly likely to be present. We have it from eminent authority that "A contract by which the defendant contracts to part with his future means of livelihood is looked upon with disfavor and will not be specifically enforced": 5 Williston on Contracts (rev. ed. 1937), §1425. And in our own State, where injunctions similar to the one here sought have been under consideration, the courts have frequently scrutinized the contracts for which enforcement was prayed in order to determine whether or not they were "hard-featured". See Light Corrugated Box Co. v. Dubison et al., supra, Erie County Milk Assn. v. Ripley, supra, and Iron City Laundry Co. v. Leyton, supra.

In the latter case the hard feature of the contract was one of the principal grounds for the refusal of the injunction. The hard feature of the present case is precisely the same, and has already been discussed with reference to the doctrine of mutuality. It is simply that defendant received absolutely no assurance from plaintiff that he would be employed for even one day. Nor was there apparently any agreement that he could not be discharged without notice, or that he could not be summarily discharged without cause. In return, therefore, for the mere fact of employment itself, wherein he was entirely at the mercy of his employer, this defendant bound himself not to pursue his occupation in a large section of Philadelphia for the period of one year. This would appear to be the sort of "hard-featured" contract which the equity courts of our State have universally refused to enforce.

In the Lajoie case it was pointed out that partial performance, that is, the actual employment of the defendant over a considerable period, brought about a situation much different from that in which the contract was wholly executory, and gave rise to an equity on behalf of the employer which he might not otherwise have had. But the court went on to point out that plaintiff had so far performed its part of the contract in entire good faith in every detail, and furthermore that it was anxious to continue defendant's employment. We are confronted with a very different situation here, where plaintiff has discharged defendant (whether with or without cause is unimportant since under the agreement plaintiff could do it either way) and is not merely seeking the enforcement of the negative covenant in order indirectly to enforce performance to itself. Plaintiff does not want defendant to deliver milk for it; it simply does not want him to deliver milk for anyone else within the prescribed territory. Under such circumstances, its "partial performance" does not seem to me sufficient to raise an equity in its favor.

". . . in each case the party seeking to enforce such a contract [has been] was required to come within the rule requiring conscionable conduct on his own part": American Ice Co. v. Hunter, supra, at p. 314.

It is not intended to be suggested that under no circumstances will a court of equity enforce a negative covenant such as the present one, even where no reciprocal promises have been made nor any reasons given for the discharge. Other factors may materially alter the equities of a given case. Each case is by itself according to its facts. Thus where the employer has given a course of instruction to the employe and has entrusted him with confidential information with regard to the manufacture or sale of its product, a court will enjoin the employe from transferring the advantage he has thus received to another employer or to himself. See Light Corrugated Box Co. v. Dubison et al., supra. Or where it is clearly shown that the employer has furnished to the employe a large portion of the goodwill which it later seeks to protect and that the employe has not established most of the contacts by himself, this may carry a great deal of weight. See Erie County Milk Assn. v. Ripley, supra, and Philadelphia Towel Supply & Laundry Co. v. Weinstein, 57 Pa. Superior Ct. 290 (1914). But plaintiff has adduced no evidence to indicate the presence of either of these factors, or of any other special circumstances which might materially alter the equities of this case. Aside from statements, it has not proved the loss of a substantial number of its customers as the result of the defendant's solicitations. One former customer testified that he had bought some milk from defendant's firm; but this was the whole extent of plaintiff's evidence as to damage. It is elementary that in any action the burden of proving his case rests primarily upon plaintiff, and that in an equitable action for an injunction this proof must attain a high degree of conviction and clarity: Pusey et al. v. Wright et al., 31 Pa. 387 (1858) ; Sparhawk v. The Union Passenger Ry. Co., 54 Pa. 401 (1867) ; City of

Philadelphia's Appeal, 78 Pa. 33 (1875). Plaintiff's evidence in the present case falls short of that requirement.

As I read the cases, enforcement of a restrictive covenant in an employment agreement does not follow, ipso facto. Restraint does not issue through mere existence of the provision. Each case has its circumstances, and the circumstances determine the chancellor's action. Where there is no "mutuality" or the contract is "hard-featured", equity withholds its arm. This is the situation here.

I do not, by deciding this case as I do decide it, intend to condone the employe's conduct—either toward his employer or toward the court. Certainly his attitude to the process of law has been indifferent, to put it in the least of condemnatory words. But I deal here with, and decide upon principle, upon ratio decidendi, and principle rises higher, much higher, than the conduct of the individual.

Plaintiff has not made out a case for equitable relief as against defendant Daniel S. McMonagle. It follows that no case has been made out against the other defendants, who were not even parties to the agreement upon which plaintiff sues. Accordingly, the bill must be dismissed as to all parties defendant.

## Conclusions of law

1. The agreement of defendant not to engage in the sale of milk within a large section of Philadelphia for the period of one year is not void as being an unreasonable restraint of trade.

2. The said agreement will not be enforced in equity for want of the necessary mutuality.

3. The said agreement is a hard-featured contract and, as such, will not be enforced by injunction.

4. Plaintiff's bill for a permanent injunction should be dismissed, and the preliminary injunction should be dissolved.

*Decree nisi*

And now, May 2, 1939, it is ordered, adjudged, and decreed:

1. That plaintiff's bill in equity is dismissed.
2. That the preliminary injunction issued against defendant Daniel S. McMonagle in this case is dissolved.
3. That plaintiff shall pay the costs of this proceeding.

The prothonotary shall notify the parties or their respective counsel of the entry of this decree nisi.